MARY E. SCHLICHER, appellant,

*v.*

HENRY H. KEELER et ux. et al., respondents.

[Argued June 17th, 1904. Decided July 5th, 1905.]

A valid delivery of a deed conveying land is not shown when it appears that it was the intention of the grantor that such delivery should relate to the date of his death.

---

On appeal from a decree in chancery advised by Vice-Chancellor Reed, whose opinion is reported in *61 N. J. Eq. (16 Dick.) 394*.

*Mr. George O. Vanderbilt* and *Mr. Alan H. Strong,* for the appellant.

*Mr. Robert S. Woodruff* and *Mr. Erwin E. Marshall,* for the respondents.

The opinion of the court was delivered by

Fort, J.

Charles Keeler, in his lifetime, executed a deed on October 18th, 1900, conveying to Henry H. Keeler, one of his sons, a tract of land, constituting what he admits to be a valuable farm in the township of Ewing, in the county of Mercer. The deed was drawn by Richard C. Chamberlain, a lawyer, in Trenton. The description was furnished to Mr. Chamberlain some few months before the deed was executed. On the morning of the day of the execution of the deed, Mr. Chamberlain says, George W. Keeler, son of Charles Keeler, called upon him, at his office, and informed him that his father was greatly exercised over the fact that he had not executed the deed, and wanted to know if Mr. Chamberlain would come up to execute it. The deed was drawn on the 18th, from a description which Chamberlain says had been ready for a long time, except two courses, which had only lately been furnished by the surveyor. It does not appear in the proof, other than by inference, who furnished the description to Chamberlain, or who employed him to draw the deed.

After the deed was executed, it was taken by Chamberlain under the circumstances hereinafter stated.

On October 21st, 1900, three days after the deed was executed, Charles Keeler died, and on that day Chamberlain recorded the deed, as he says, of his own motion, without the direction of anyone.

On October 29th, 1900, for a consideration of $1, Henry H. Keeler conveyed a one-half interest in this farm to George W. Keeler, and this deed was recorded October 30th, 1900.

Charles Keeler died intestate. The deceased left seven children, five being the complainants and two the defendants in this suit.

The bill was filed November 2d, 1900, and prayed for a decree that the deeds from Charles Keeler to Henry H. Keeler, and from Henry H. Keeler and wife to George W. Keeler, be declared fraudulent and null and void, and that the complainants

be each decreed to be seized and possessed of an undivided one-seventh interest in the lands mentioned in said deeds; and that said Henry H. Keeler and wife, and George W. Keeler and wife, be required to deliver up the said deeds that the same may be canceled, or that they be required to reconvey to each of the complainants an undivided one-seventh interest in the lands in question.

At the time the deed to Henry was executed by Charles there were present, besides Mr. Chamberlain, George W. Keeler, one of the defendants, to whom a half interest in the farm was afterwards conveyed, and Louis Keeler, a brother of Charles. They have all testified, and are the only witnesses.

The decree of the court of chancery was that the bill be dismissed.

The proof in the cause is in a very narrow compass.

Mr. Chamberlain testifies that the grantee was blank in the deed when he took it to the intestate's house, and that, after reading it and receiving directions to insert the name of Henry H. Keeler, he went over to the window sill and wrote the name in, and that Mr. Keeler, who was sitting by the fireplace, walked across the room to the window and signed his name and acknowledged it, and then went back and sat in a chair by the fireplace. Then his testimony proceeds as follows:

"*A.* I handed him the deed and I told him I wanted him to make a delivery to me.

"*Q.* Just repeat the language you used to him—how did you address him?

"*A.* I handed the deed to him, and said, 'Mr. Keeler, I want you to deliver this deed to me as the agent of Henry, the grantee;' and he had the deed and handed it to me, and he said, 'You will hold it, or keep it until the last day?' and I said, 'I will.'

"*Q.* You said to him, 'Mr. Keeler, I want you to hand me this deed, to hold or keep it as the agent of Henry?'

"*A.* No, sir; 'I want you to deliver this deed to me as the agent of Henry, the grantee.'

"*Q.* That is all right; now, what did he say?

"*A.* He handed it to me; he handed me the deed, and he said, 'Keep it until the last day.'

"*Q.* Did he say anything else?

"*A.* About that?

"*Q.* Yes.

"A. No, sir; I don't think he did; I don't remember anything else.

"Q. What did you say?

"A. I told him he could rest assured of that, or something to that effect; he could rely on that; he need not think of that."

George W. Keeler differs very little in his statement. This is what he says:

"Q. Then what happened?

"A. Then Mr. Chamberlain—he completed the writing to the paper, the acknowledgment, and my father seated himself again, and Mr. Chamberlain seated himself opposite him, and he filled up the paper and handed it to my father."

"Q. Yes, go on.

"A. So my father, he then handed it back to Mr. Chamberlain, and he says, using his expression again, 'You hold that until the wind leaves me;' and Mr. Chamberlain says, 'Mr. Keeler, what do you mean by that?' 'Well,' he says, 'I want you to take it home with you and hold it;' Mr. Chamberlain says to my father, now, he says, 'Mr. Keeler, do you hand me this as the agent of Henry, to hold for Henry, and deliver it upon your death?' and my father says, 'Yes, sir;' Mr. Chamberlain then placed the deed in his pocket and he comes to Trenton with it."

Mr. Louis Keeler, the other witness on this subject, testified as follows:

"Q. Then what was said by either Mr. Chamberlain or Mr. Keeler?

"A. Why, they walked back again to his seat, and then Mr. Chamberlain did some writing there—signed some name—and then he folded up the paper and gave it to Mr. Keeler, and told him to hand it back to him, to hold it for him—to hold it—and he said, 'Yes;' so Mr. Chamberlain handed him the paper and Mr. Keeler handed it back to Mr. Chamberlain again.

"Q. Mr. Keeler handed the paper back again?

"A. Yes, sir.

"Q. And what was said?

"A. He told him to hold it until later on.

"Q. What was the expression used?

"A. 'Hold it to the last day,' or something like that.

"Q. Some such expression as Mr. Chamberlain has testified to?

"A. Yes, sir; something like that."

Mr. Chamberlain was recalled and an effort made to get him to change the substance of his testimony, but he adhered to it as above given.

This review of the testimony makes it clear that Charles Keeler did not intend to make a present delivery to Henry by handing the deed to Chamberlain. No evidence is given of a single statement by him that indicates such an intention on his part. He did not ask Mr. Chamberlain to take or carry the deed away. He made no voluntary request of him to take the deed or make delivery of it. Every utterance of Charles Keeler was in response to some suggestion. Mr. Chamberlain says, after describing how the deed was signed, "I handed the deed to him and said, 'I want you to deliver this deed to me as the agent of Henry, the grantee.'" And he says that thereupon Mr. Keeler handed it to him and asked, "You will hold it or keep it until the last day? and I said, 'I will.'" In another place he states that Mr. Keeler said, when he handed him the deed, "Keep it until the last day." And that he (Chamberlain) replied, "He could rest assured of that; he could rely on that; he need not think of that."

Can there be doubt of the fact that these statements, coming from his legal adviser, satisfied him that he still held the title to the property? Upon the proof I am clear that Charles Keeler did not believe he was making a present delivery of the deed by thus leaving it in the hands of Chamberlain. It is inconceivable that he intended, by the mere handing of the deed to Chamberlain under the circumstances detailed, to presently vest the title in the land in Henry H. Keeler and divest himself thereof.

The proof establishes, to my satisfaction, that he did not make a delivery of the deed.

A deed does not become operative until it is delivered with the intent that it shall become effective as a conveyance. To constitute a good delivery, it must appear from the circumstances of the transaction that it was the grantor's intention to part with the deed, and thereby put the title in the grantee. *1 Devl. Deeds* § 262; *Crawford* v. *Bertholf,* 1 *N. J. Eq.* (*Sax.*) *458, 467; Folly* v. *Vantuyl, 9 N. J. Law* (*4 Halst.*) *153, 159* (*Chief-Justice Ewing*)*; Farlee* v. *Farlee, 21 N. J. Law* (*1 Zab.*) *285; Maynard* v. *Maynard 10 Mass. 456; Mills* v. *Gore, 20 Pick.*

Schlicher *v.* Keeler.                    *67 Eq.*

*28;* *Stilwell* v. *Hubbard, 20 Wend. 44; Masterson* v. *Cheek, 23 Ill. 72, 76.*

Fraud was not relied upon on the trial below, nor is it urged here; but the circumstances surrounding the making of this deed, however, require us to give to the words employed by Charles Keeler, at the time the deed is alleged to have been delivered, every intendment against the claim that there was a present delivery.

It was suggested that this conveyance from Charles Keeler to his son Henry could be sustained as a grant to take effect after his death, but we are unable to see how this could be, except it be considered in the nature of a testamentary devise, and as it is not in the form required by our statute of wills for such a devise, to so hold, to use the language of Chief-Justice Gummere, "would be to practically repeal the statute of wills." *Stevenson* v. *Earl, 65 N. J. Eq. (20 Dick.) 721.*

The decree will be reversed and the record remitted to the court of chancery, with directions to that court to enter a decree setting aside the conveyance of Charles Keeler to Henry H. Keeler, and of Henry H. Keeler and wife to George W. Keeler, and declaring them to be null and void.

*For affirmance*—THE CHIEF-JUSTICE, PITNEY, BOGERT—3.

*For reversal*—DIXON, GARRISON, FORT, VREDENBURGH, VROOM, GREEN—6.